IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MICHAEL FIOCCA, | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | No. 18-5409 |
| v. | : | |
| | : | |
| CITY OF PHILADELPHIA, et al. | : | |
| Defendants. | : | |

December 17, 2020                                                                                     Anita B. Brody, J.

### MEMORANDUM

Plaintiff Michael Fiocca ("Fiocca") brings suit against Defendants City of Philadelphia ("City") and Lieutenant Jonah Conway ("Conway"). Fiocca alleges that the City retaliated against him in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq*. Additionally, Fiocca alleges that the City and Conway retaliated against him for exercising his First Amendment rights in violation of 42 U.S.C. § 1983.[1] I exercise federal question jurisdiction over Fiocca's claims pursuant to 28 U.S.C. § 1331. Defendants move for summary judgment. For the below reasons, I will grant Defendants' motion for summary judgment.

---

[1] "A municipality or other local government may be liable under [42 U.S.C. § 1983] if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation." *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (quoting 42 U.S.C. § 1983). "[F]or municipal liability to attach, any injury must be inflicted by 'execution of a government's policy or custom.'" *Santiago v. Warminster Twp.*, 629 F.3d 121, 135 (3d Cir. 2010) (quoting *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978)). Because Fiocca does not identify any custom or policy of the City, I will grant summary judgment on Fiocca's § 1983 claim against the City. As discussed below, Fiocca's § 1983 claim against the City also fails because Fiocca cannot establish a violation of his First Amendment rights. *See Brown v. Commonwealth of Pennsylvania, Dep't of Health Emergency Med. Servs. Training Inst.*, 318 F.3d 473, 482 (3d Cir. 2003) ("[F]or there to be municipal liability, there . . . must be a violation of the plaintiff's constitutional rights.").

## I. BACKGROUND[2]

On May 22, 1989, Michael Fiocca began working for the City of Philadelphia in the Philadelphia Police Department. Pl.'s Aff. 1; Pl.'s Dep. 15:17-19. In 2003, Fiocca was assigned to work in the Philadelphia Police Department Forensic Science Unit ("FSU"). Pl.'s Dep. 20:2-16.

Starting in 2015 or 2016, Fiocca and the other officers in the FSU gained access to the daily attendance records sheets ("DARS") of all officers in the FSU. Pl.'s Dep. 36:1-7, 39:8-11; Fiocca's access to DARS enabled him to see the vacation and sick balance, as well as the amount of overtime worked for every officer in the FSU. Pl.'s Dep. 43:21-44:15.

Based upon his access to DARS, Fiocca believed that he had been denied overtime. Pl.'s Aff. 1. On July 1, 2016, Fiocca filed a lawsuit against the City, alleging that he had been unlawfully denied overtime ("Prior Lawsuit"). Pl.'s Aff. 1; Complaint, *Fiocca v. City of Philadelphia, et al.*, No. 16-3618 (E.D. Pa. July 1, 2016). On February 6, 2017, the Prior Lawsuit was dismissed after the parties reached a settlement. Order, *Fiocca v. City of Philadelphia, et al.*, No. 16-3618 (E.D. Pa. Feb. 6, 2017); Pl.'s Dep. 12:18-22.

On March 22, 2017, Fiocca's supervisor at the FSU, Defendant Lieutenant Jonah Conway, called Fiocca into his office and inquired about Fiocca's Prior Lawsuit:

> [Conway] stated; "I hear you have sued the City."
> [Fiocca] responded that I did.
> [Conway] specifically asked, "did you win?"
> [Fiocca] told [Conway] that I could not discuss it. I told him that the judge had told me that I could not discuss it. I specifically said; "I could not discuss it with you or anyone."
> At that point, [Conway] shook his head and said "okay."

Pl.'s Aff. 2-3.

---

[2] The facts are presented in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

In either 2017 or 2018, Fiocca realized the he no longer had access to DARS. Pl.'s Dep. 59:19-24.  "At first, [he] thought this was just a glitch because other officers had access and [he] did not."  Fiocca complained to Conway about his loss of access to DARS.  Pl.'s Dep. 61:15-62:15.  Conway informed Fiocca that he had terminated Fiocca's access to DARS and told him that "if he wanted access [he] had to write a letter to the police department – IT Department downtown in order to get access."  66:20-24. Fiocca spoke with IT and learned that Conway had terminated his access to DARS on or about June 20, 2017.[3]  Pl.'s Aff. 2.  "Shortly after [Fiocca's] complaint to IT, some other officers, were also denied access."[4]  Pl.'s Aff. 2.

Conway "determined that non-supervisory employees should not have access to DARS records belonging to other employees."  Conway Aff. ¶ 4.  As a result, he terminated the FSU police officers' DARS access "in the interest of privacy."  *Id*.  The decision to revoke access to DARS "brought the FSU in compliance with the remainder of the Department."  *Id.* at ¶ 7.

After Conway told Fiocca that he had revoked Fiocca's access to DARS, Fiocca noticed that his coworkers wouldn't talk to him.  Pl.'s Dep. 122:4-11.  Fiocca continued to complain to Conway about losing access to DARS.  Pl.'s Aff. 2.  Fiocca sent Conway "a series of messages containing insubordinate remarks."  Conway Aff. ¶ 6. Additionally, Fiocca sent a message to another supervisor complaining about his loss of

---

[3] Conway avers that "[i]n or about early 2018, [he] terminated FSU Police Officers' access to other officer's DARS data."  Conway Aff. ¶ 5.

[4] Despite Fiocca's assertions in his affidavit that some officers did not lose access to DARS or their access was revoked later, Fiocca stated during his deposition that he did not know whether all of the officers in the FSU had lost access.  Pl.'s Dep. 60:1-3.  Counsel followed up by asking Fiocca, "Do you believe some officers did not lose their access?"  Pl.'s Dep 61:9-10.  Fiocca responded, "I don't know."  Pl.'s Dep. 61:13.

access to DARS.  Pl.'s Dep. 90:16-19.  The message included the statement, "You can talk to Conway dick head -- yeah that's what I called him -- and tell and rat on me like a little effing pussy that you are."  Pl.'s Dep. 91:4-7.  In addition, Fiocca also told the supervisor, "Meet me one on one . . . and I will straighten your effing ass out."  Pl.'s Dep. 94:6-8.  Fiocca acknowledges that the message contained inappropriate language for a workplace email.  Pl.'s Dep. 92:14-16.

On March 18, 2018, Police Inspector Aaron Horne informed Fiocca that he was being transferred involuntarily from the FSU to the Delaware Valley Intelligence Center ("DVIC") and his service weapon would be taken away.  Pl.'s Aff. 3.  Fiocca believes he was transferred because he "had a disagreement with Lieutenant Conway . . . in regards to the computer issue with the computer access."  Pl.'s Dep. 74:9-16.

For two months, Fiocca worked at the DVIC.  Pl.'s Dep. 79:21-22.  While at the DVIC, Fiocca was never given a single assignment.  Pl.'s Dep. 79:24-80:1.  Fiocca would show up for his overnight shift in a warehouse, the lights would go off, and he would "sit in the corner all by [him]self for eight hours in the dark."  Pl.'s Dep. 78:19-79:15.  There was a monitor that showed cameras posted throughout the City, but Fiocca was not assigned to watch for anything on the monitor.  Pl.'s Dep. 86:1-88:4.

During his shifts at the DVIC, Fiocca couldn't use his phone or do anything.  Pl.'s Dep. 79:19-20.  He "couldn't even go to the bathroom because [he] couldn't even see where the bathroom was.  There were no lights on."  Pl.'s Dep. 80:19-21.

"[B]eing [at the DVIC] for two months in the dark was overwhelming for [Fiocca] and humiliating to [Fiocca]."  Pl.'s Dep. 82:2-4.  In May 2018, Fiocca resigned

because of the working conditions at the DVIC.  Pl.'s Aff. 3; Pl.'s Dep. 72:22-73:18, 96:23-97:2.

## II. LEGAL STANDARD

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A factual dispute is "genuine" if the evidence would permit a reasonable jury to return a verdict for the nonmoving party.  *Id.*  In ruling on a motion for summary judgment, the court must draw all inferences from the facts in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  After the moving party has met its initial burden, the nonmoving party must then "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Id.* at 322.  Both parties must support their factual positions by: "(A) citing to particular parts of materials in the record . . . ; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).  The materials in the record that parties may rely on include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1)(A).  In opposing a motion for summary judgment, the nonmoving party may not "rely

merely upon bare assertions, conclusory allegations or suspicions." *Fireman's Ins. Co. of Newark, N.J. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982).

The inquiry at summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

## III. DISCUSSION

Fiocca contends that Defendants retaliated against him in violation of his First Amendment rights and Title VII. Defendants move for summary judgment on Fiocca's claims on the basis that Fiocca cannot establish the elements of a First Amendment retaliation claim or a prima facie case of retaliation under Title VII.

To establish a First Amendment Retaliation claim, a plaintiff must prove "(1) that [he or she] engaged in a protected activity, (2) that defendants' retaliatory action was sufficient to deter a person of ordinary firmness from exercising his or her rights, and (3) that there was a causal connection between the protected activity and the retaliatory action." *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007). A prima facie case of retaliation under Title VII requires essentially the same elements. *Holt v. Pennsylvania*, No. CIV.A. 10-5510, 2014 WL 2880376, at *13 (E.D. Pa. June 25, 2014).

To establish a prima facie case of retaliation under Title VII, a plaintiff must prove that "(1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action." *Moore v. City of Philadelphia*, 461 F.3d 331, 340–41 (3d Cir. 2006), *as amended* (Sept. 13, 2006) (quoting *Nelson v. Upsala Coll.*, 51 F.3d 383, 386 (3d Cir. 1995)). Under Title VII, a plaintiff must show that a challenged

action is materially adverse and "well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)).

Fiocca argues that his claims should survive summary judgment because he has put forth evidence that: (1) he engaged in a protected activity—refusing to disclose to Conway the settlement terms of his Prior Lawsuit; (2) Defendants took adverse employment actions against him—removing his access to DARS, taking away his gun, and transferring him to the DVIC; and (3) there is a causal connection between his protected activity and Defendants' adverse employment actions. Defendants argue that Fiocca's claims must be dismissed because he has not established that he engaged in an activity protected by the First Amendment, that he suffered an adverse employment action, or that a causal connection exists between his protected activity and any adverse employment action. Because both a First Amendment retaliation claim and a prima facie case of retaliation under Title VII require proof of causation[5]—proof Fiocca has not produced—the Court will address these claims together and dismiss them for lack of causation.[6]

Defendants argue that Fiocca cannot establish a causal connection between his protected activity—refusal to disclose the settlement of his Prior Lawsuit and Defendants' adverse employment actions—termination of Fiocca's access to DARS, removal of his gun, and his

---

[5] Although Plaintiff's ultimate burden in a Title VII retaliation claim is to prove that retaliatory animus was the but-for cause of the adverse employment action, "a plaintiff alleging retaliation has a lesser causal burden at the prima facie stage." *Carvalho-Grevious v. Delaware State Univ.*, 851 F.3d 249, 259 (3d Cir. 2017). "[A]t the prima facie stage the plaintiff must produce evidence 'sufficient to raise the inference that her protected activity was the *likely reason* for the adverse [employment] action.'" *Id.* (quoting *Kachmar v. SunGard Data Systems, Inc.*, 109 F.3d 173, 177 (3d Cir. 1997)). To establish causation for a First Amendment retaliation claim, a plaintiff "must show that his protected activity was a substantial or motivating factor in the alleged retaliatory action." *Ambrose v. Twp. of Robinson, Pa.*, 303 F.3d 488, 493 (3d Cir. 2002)

[6] Because no causal connection exists between the alleged protected activity and the alleged adverse employment actions, it is unnecessary to address whether Fiocca engaged in an activity protected by the First Amendment or that he suffered an adverse employment action.

forced transfer to the DVIC.  To establish a causal connection, a plaintiff must proffer evidence of "an employer's inconsistent explanation for taking an adverse employment action, a pattern of antagonism, or temporal proximity 'unusually suggestive of retaliatory motive.'" *Carvalho-Grevious v. Delaware State Univ.*, 851 F.3d 249, 260 (3d Cir. 2017) (citations omitted) (quoting *Shaner v. Synthes*, 204 F.3d 494, 505 (3d Cir. 2000)); *see also Lauren*, 480 F.3d at 267.  "These are not the exclusive ways to show causation, as the proffered evidence, looked at as a whole, may suffice to raise the inference." *Carvalho-Grevious*, 851 F.3d at 260 (quoting *Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 177 (3d Cir. 1997)).  "A court must be diligent in enforcing these causation requirements because otherwise a public actor cognizant of the possibility that litigation might be filed against him, particularly in his individual capacity, could be chilled from taking action that he deemed appropriate and, in fact, was appropriate." *Lauren*, 480 F.3d at 267.

Fiocca argues that he has established a causal connection by demonstrating an unusually suggestive temporal proximity between his refusal to disclose the settlement terms of his Prior Lawsuit and Defendants' termination of his access to DARS, removal of his gun, and forced transfer to the DVIC.  Fiocca also argues that he has shown a pattern of antagonism sufficient to establish a causal connection.

Temporal proximity provides an evidentiary basis from which an inference of causation can be drawn.  *Carvalho-Grevious*, 851 F.3d at 260.  The Third Circuit has held that "on its own, an intervening temporal period of two days may raise the inference of causation but that a period of two months cannot." *Id.* at 261 n.8 (citing *Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989); *Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 759–60 (3d Cir. 2004)).

Fiocca alleges that he engaged in a protected activity on March 22, 2017 when he refused to disclose to Conway the settlement terms of his Prior Lawsuit. Conway did not terminate Fiocca's access to DARS until June 20, 2017. Moreover, it wasn't until March 18, 2018 that Fiocca was transferred to the DVIC and his gun was removed. Almost three months passed between Fiocca's refusal to discuss the Prior Lawsuit and Defendants' first alleged adverse employment action—termination of Fiocca's access to DARS. An intervening temporal period of three months between a protected activity and an adverse employment action is not unusually suggestive of retaliatory motive and is insufficient to establish the requisite causal connection.[7]

Fiocca also contends that he has established a causal connection between his failure to discuss his Prior Lawsuit and Defendants' adverse employment actions by demonstrating a pattern of antagonism. Fiocca, however, does not establish that Defendants engaged in any type of antagonism during the intervening three months between when Fiocca refused to discuss his settlement on March 22, 2017 and when Conway revoked his DARS access on June 20, 2017. Only after Fiocca began to complain to Conway about the termination of his access to DARS did things change for Fiocca. At first, his coworkers stopped talking to him. Fiocca continued to complain, he called Conway a "dick head," Pl.'s Dep. 91:4-7, and sent Conway "a series of messages containing insubordinate remarks," Conway Aff. ¶ 6. Then, Fiocca was transferred to the DVIC and his gun was taken away.

---

[7] It is questionable whether Fiocca's loss of access to DARS even amounts to an adverse employment action. To be considered adverse, an action must be "sufficient to deter a person of ordinary firmness from exercising his or her rights." *Lauren*, 480 F.3d at 267; *see also Burlington*, 548 U.S. at 68. Because there is no causal connection between Fiocca's protected activity and any of his alleged adverse employment actions, it is unnecessary to determine whether removing an employee's access to his coworkers' vacation, sick, and overtime balances would deter a reasonable person from exercising his or her rights.

Although Fiocca now argues that his transfer to the DVIC and the removal of his gun were causally connected to his refusal to speak to Conway about his Prior Lawsuit, Fiocca testified under oath that he was transferred because he "had a disagreement with Lieutenant Conway . . . in regards to the computer issue with the computer access." Pl.'s Dep. 74:9-16. The chronology of events does not suggest that any adverse employment action was taken against Fiocca because he refused to speak about his Prior Lawsuit. Rather, if anything, Fiocca's transfer and the removal of his gun were in response to Fiocca's complaints about his loss of access to DARS—complaints that Fiocca acknowledges were not protected activity and contained insubordinate remarks. *See* Pl.'s Mem. Opp'n 1. Because Fiocca has not demonstrated a pattern of antagonism that resulted from his refusal to disclose to Conway the settlement terms of his Prior Lawsuit, he has failed to establish a causal connection between his protected activity and Defendants' adverse employment actions. Therefore, Fiocca cannot succeed on either his Title VII or his First Amendment retaliation claim.

**IV. CONCLUSION**

For the above reasons, I will grant Defendants' motion for summary judgment.


  s/ANITA B. BRODY, J.
  ANITA B. BRODY, J.


COPIES VIA ECF